# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| iPhone White | ) ) | |

**FILED**

FEB 1 3 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFO~
BY ~

## 19MJ0651

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachement A-3, incorporated herein by reference

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841(a)(1);846;843 | Possession of Methamphetamine with Intent to Distribute;Conspiracy to do same |
| Title 18 U.S.C. 922(g)(1) | Felon in Possession of a Firearm |

The application is based on these facts:
See attached affadavit of Special Agent Nicole Martin

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nicole Martin, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/12/19

_____
*Judge's signature*

City and state: San Diego, California

Hon. William V. Gallo United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Nicole Martin, being duly sworn, declare and state:

### PURPOSE OF AFFIDAVIT

1.      This affidavit supports applications for warrants to search the following cellular phones:

a.      Black LG Model #LM-X210MA with IMEI 357093-09-278403-6 (**Target Telephone-1**);

b.      Google Cell Phone G-2PW-2100-021A (**Target Telephone-2**);

c.      iPhone White (**Target Telephone-3**);

d.      Samsung Galaxy S6 Edge Cell Phone IMEI 352567070502804 (**Target Telephone-4**);

e.      iPhone White Gucci Case (**Target Telephone-5**);

f.      Blackberry Cell Phone Model 8390 FCC ID: L6ARBU20CW (**Target Telephone-6**);

g.      iPhone Model A1522 IMEI 354393066066359 (**Target Telephone-7**);

h.      ZTE Black/Grey Cell Phone (**Target Telephone-8**);

i.      Black Samsung Model #SM-J727TI with IMEI 354804093088711 (**Target Telephone-9**);

j.      Black LG Model #LGMP260 with IMEI 354446-09-869259-0 (**Target Telephone-10**);

k.      Gold colored Samsung Model SM-G531/DS S/N R51M32EXPBB IMEI: 357769078767760 (**Target Telephone – 11**);

l.      BLU Smartphone Model Energy x2 with IMEI1 358103070076484 and IMEI2 358103070241484 (**Target Telephone-12**);

m.      Samsung Galaxy Model S4 with IMEI 990004943729651 (**Target Telephone-13**);

n.     Apple iPhone IMEI 358810058327925 (**Target Telephone-14**);

o.     Samsung Phone FCC ID: A3LSPHL710 (**Target Telephone-15**);

p.     Apple iPhone FCC ID: BCG-EZ816A IMEI 359481082349514 (**Target Telephone-16**);

q.     LG Model LGMP260 S/N 807CXYQ1135690 FCC ID: ZNFT (**Target Telephone-17**);

r.     Apple iPhone Model A1784 with IMEI FCC ID: BCG-E3092A (**Target Telephone-18**);

s.     ZTE Black Cell Phone(**Target Telephone-19**);

t.     Moto Cell Phone Gold Colored IMEI 355674086488254(**Target Telephone-20**);

(collectively, **Target Telephones**), as described in Attachments A-1 through A-20.

2.     Based on the information below, there is probable cause to believe evidence of crimes in violation of Title 21, United States Code, Sections 841, 846, and 843 (Distribution of Controlled Substances, Possession of Controlled Substances for Distribution, Conspiracy to Distribute Controlled Substances, and Illegal Use of a Communication Facility) and Title 18, United States Code, Sections 922(g)(1) and 922(a)(1)(A) (Felon in Possession of Firearm), as described in Attachment B will be found in the **Target Telephones**.

3.     As outlined below, the **Target Telephones** were seized on various dates and locations during the course of a Title III investigation and all **Target Telephones** are being held as evidence in the Southern District of California.

4.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by task force officers from the Violent Crimes Task Force (VCTF) or other multi-agency federal, state, and local drug/gang task force officers with whom I have spoken, whom were involved in this investigation, or whose reports I have

read and reviewed. In this affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded language in parenthesis and/or brackets. Those interpretations are based upon my training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

5.   Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified above, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

**TRAINING AND EXPERTISE**

6.   I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7) who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

7.   I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since February 2015. I am currently assigned to the FBI-led Violent Crimes Task Force-Gang Group. My duties include the investigation and apprehension of individuals involved in violent gang-related activities as well as drug trafficking and distribution. Prior to becoming a Special Agent with the FBI, I was employed as a Staff Operations Specialist (SOS) with the FBI Counterterrorism Division from 2011-2014 and later with the Baltimore Division- Maryland Child Exploitation Task Force from 2014-2015.

8.   I received twenty (20) weeks of training at the FBI Academy in Quantico, Virginia. Through my employment as a SA with the FBI, I have become familiar with, and have participated in the traditional methods of drug and gang investigations. I have gained valuable insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out

3

1   their violent crime, drug trafficking activities, and their efforts to launder their drug
2   proceeds and proceeds of other criminal activity.

3       9.      As an FBI Special Agent, I have participated in various arrests for drug-
4   related and gang-related offenses. I have participated in approximately six (6) gang
5   investigations that involved various investigative techniques, including, but not limited
6   to: debriefing individuals who engaged in criminal activities, handling of informants
7   and cooperating witnesses, physical and electronic surveillance, the use of search
8   warrants, pen registers, Title-III intercepts, and undercover operations. I have also
9   monitored or overheard numerous calls or meetings between informants and drug
10  traffickers. I have received training and gained experience in interview and
11  interrogation techniques, arrest procedures, search warrant applications, the execution
12  of searches and seizures, gang enterprise investigations, and various other criminal law
13  and procedures.

14      10.     Several of the investigations in which I have participated involved San
15  Diego-area Hispanic street gangs and the Mexican Mafia. Through the course of these
16  investigations, as well as through conversations with other law enforcement officials
17  with experience investigating the Mexican Mafia and other Hispanic street gangs, I have
18  gained substantial knowledge of the Mexican Mafia and Hispanic street-gangs as well
19  as the investigative techniques necessary to prosecute them successfully.

20      11.     As a result of my training and experience, I am familiar with how drug
21  traffickers and gang members speak to each other and generally conduct business. For
22  example, I am aware that drug traffickers and gang members discuss criminal matters
23  over the phone and often speak in code or speak vaguely.  In this affidavit, where
24  participants in a recorded and/or intercepted conversation used either coded
25  terminology or oblique references to specific facts in an effort to thwart law
26  enforcement investigative efforts, I have included my interpretation of that code and/or
27  omitted conversation in brackets.  I am also aware of how drug traffickers and gang

28

1  members organize and run their illegal activities, including how they use locations in
2  furtherance of their criminal conduct.

3      12.   My training and experience as a law enforcement officer, and my
4  conversations with other Special Agents of the FBI, Drug Enforcement Administration
5  (DEA), California Department of Justice (CALDOJ), Bureau of Alcohol Tobacco
6  Firearms and Explosives (ATF), Parole Special Investigative Unit Special Agents,
7  immigration and Customs Enforcement (ICE), detective and officers of the San Diego,
8  Chula Vista, and National City Police Departments (SDPD, CVPD, NCPD
9  respectively), detectives and officers of the San Diego County Sheriff's Department
10  (SDSD), and numerous other local investigators familiar with violent crime, narcotics
11  trafficking, gang activity, and money laundering matters, form the basis of the opinions
12  and conclusions set forth below.

13      13.   In my training and experience, I have learned that individuals engaged in
14  narcotic trafficking often use their cell phones and electronic media to conspire, plan
15  and coordinate their criminal activities and that cellphones and electronic media retain
16  evidence of their crimes such as communications, photographs, videos, contact
17  information of co-conspirators, location data, travel arrangements, and financial data
18  that evidence criminal activities.

19  **FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**
20  <u>**Background**</u>
21

22      14.   Starting in September 2017, the FBI led Violent Crimes Task Force
23  (VCTF) began investigating methamphetamine distribution and firearms trafficking by
24  San Diego-area Hispanic street gangs and the Mexican Mafia. During the course of the
25  investigation, the Government sought and received authorization to conduct electronic
26  surveillance on a number of telephones used by the defendants and their coconspirators.
27  The monitoring of those telephones, coupled with the extensive use of conventional
28  investigative techniques, enabled the Government to gather the evidence necessary to

successfully prosecute over twenty two individuals involved in firearms offenses, violent crimes and the distribution of multiple pound quantities of methamphetamine throughout San Diego County.[1]  The following chart summarizes the court-authorized wiretaps in this case.

| Date Of Authorization | Authorizing Judge | Target Telephone(s) | State/Federal |
|---|---|---|---|
| 5/14/18 | Hon. Dana M. Sabraw | (619) 748-5316 (TT#1) (214) 646-7954 (TT#2) | Federal |
| 6/12/18 | Hon. Larry A. Burns | (619) 748-5316 (TT#1) (619) 802-2137 (TT#3) | Federal |
| 8/13/18 | Hon. Larry A. Burns | (619) 802-4137 (TT#4) | Federal |

15.   Notably, the Government confirmed that an individual named Fady ESHO, who is charged in case 18CR3424-LAB and 18cr4217-LAB for drug and weapons charges, was distributing multiple pound-quantities of methamphetamine to individuals in San Diego and elsewhere. Agents monitoring ESHO's telephone also learned that he had provided an AR-51 style assault weapon to an individual later identified as Robert Welsh.  Surveillance of that weapon transaction led to the identification of Welsh's residence, where agents executed a search warrant on July 16, 2018.  The search of Welsh's residence resulted in the seizure of over 220 firearms, including guns with

---

[1]   The defendants identified through this investigation are being prosecuted in six related cases currently pending before the Court:  18CR3424-LAB; 18CR4214-LAB; 18CR4215-LAB; 18CR4216-LAB; 18CR4217-LAB; 18CR4218-LAB; and 18CR4219-LAB.

1  obliterated serial numbers, stolen weapons, guns modified to be fully automatic, and
2  silencer devices.

3      16.    Subsequently, Jorge GONZALEZ, who is charged in 18cr4218-LAB, stepped
4  into the void created by the arrest of ESHO and took over ESHO's methamphetamine
5  distribution business. Indeed, based on the court-authorized wiretap on ESHO's telephone
6  it appeared that both GONZALEZ and ESHO used the same methamphetamine source of
7  supply – Jesus RAMIREZ, aka "Chuy", who is also charged in 18cr4218-LAB. Of
8  particular concern is GONZALEZ's status as a Lomita gang associate who has regular
9  contact with other documented Hispanic gang members in Southern San Diego County. In
10  fact, intercepted calls have confirmed GONZALEZ's ongoing involvement in the
11  distribution of methamphetamine to numerous individuals on a daily basis.

12      17.    Although this several month investigation has produced overwhelming
13  evidence regarding the users of the **Target Telephones** involvement in the conspiracy to
14  distribute narcotics, set forth in the paragraphs below are mere examples of various actions
15  that confirm that the users of the **Target Telephones** are conducting drug-related activities.

16      18.    During the course of this investigation, law enforcement has conducted
17  multiple state and federal search warrants at locations associated with targets of this
18  investigation. Additionally, investigators requested law enforcement to conduct
19  investigative traffic stops of several of the targets of this investigation. The investigative
20  traffic stops and search warrants have resulted in multiple seizures of large quantities of
21  methamphetamine from targets of this investigation. Based on the content of the
22  intercepted calls outlined in this affidavit and the seizures outlined below, I believe that the
23  conversations outlined below are regarding narcotics transactions. Further, there is
24  probable cause to believe evidence of crimes in violation of Title 21, United States Code,
25  Sections 841, 846, 952, 960 and 843 (Distribution of Controlled Substances, Conspiracy
26  to Distribute Controlled Substances, Importation of a Controlled Substance, Illegal Use of
27  a Communication Facility) and Title 18, United States Code, Section Sections 922(g)(1)
28

and 922(a)(1)(A) (Felon in Possession of Firearm), as described in Attachments B will be found in the **Target Telephones.**

## **TARGET TELEPHONES-1 THROUGH 8**

19.    During the course of this investigation, Jose HERNANDEZ "Chapo" suspected user of **Target Telephone-1**, Jesus Ramirez "Chuy" suspected user of **Target Telephones-2,3,4,5,6,7** and David Gautreau "Devil" suspected user of **Target Telephone-8**, have been intercepted coordinating large narcotics transactions with various individuals. Below are various examples of conduct law enforcement successfully intercepted.

### **4 Pound Methamphetamine Seizure on May 25, 2018**

20.    On May 25, 2018, Jesus Alfredo RAMIREZ, aka "Chuy" supplied Fady ESHO with four pounds of methamphetamine.  ESHO provided that methamphetamine to Jose HERNANDEZ, who then sold it to Dale CHANEY (who had travelled from Florida to San Diego to pick up the methamphetamine).   CHANEY packaged the methamphetamine and attempted to send it via USPS Express Mail Service from "Dave Knight, 2548 Calle Serena, San Diego, CA 92139," to a name/address in Florida: "Mike Caldwell, 120 Landis St., New Smyrna Beach, FL 32168."   At the request of agents handling this investigation, the package was intercepted by an employee of the United States Postal Inspection Service.  A federal search warrant for the package was obtained from the Honorable Mitchell D. Dembin and the warrant was executed on May 30, 2018.  The package contained approximately 4 pounds of methamphetamine.

21.    A portion of the communications surrounding that methamphetamine deal are set forth below.

22.    On May 24, 2018, Jose HERNANDEZ placed a call to Dale CHANEY. During the call, CHANEY stated that he was going to "catch a plane about 5 o'clock" and would "be there [in San Diego] by 9."  CHANEY said he was "looking to try to get like 4 cars to paint" [purchase 4 pounds of methamphetamine].

23.    On May 25, 2018, Dale CHANEY placed a call to Jose HERNANDEZ and asked, "how much is it going to come to?" [how much would the 4 pounds of

methamphetamine cost].   HERNANDEZ replied, that he could not do it for "10,000" [the $10,000 CHANEY stated he had "on me right now"], then stated, "it was 11 something, last time, no?" [the last 4 pounds he sold to CHANEY cost a little over $11,000].  CHANEY responded, "yeah like 11-2" [the prior selling price was $11,200]. CHANEY then complained that "it cost me like $2,000 to fly out here and back" and stated that "if you could bring it to me that'd be better . . . cuz what I gotta do is I gotta go to the post office to get a box and everything and I want to show you how I do it." HERNDANDEZ replied, "okay."

24.    On May 25, 2018, Jose HERNANDEZ called Fady ESHO and stated that "his homie just called" [CHANEY had just called].  ESHO asked, "how many should I bring?" HERNANDEZ replied, "he said four units." ESHO stated, "I'll bring 'em right now."   In a follow-up call to HERNANDEZ, ESHO confirmed that "it's gonna be 8,000" [he would sell the 4 pounds of methamphetamine to HERNANDEZ for $8,000].

25.    In connection with the intercepted calls, surveillance agents observed the delivery of the 4 pounds of methamphetamine from ESHO to HERNANDEZ and then the subsequent delivery of that same methamphetamine from HERNANDEZ to CHANEY.  Agents then followed CHANEY from his motel to the post office at 2701 Midway Drive, San Diego, CA 92110, where he mailed the above-noted package containing 4 pounds of methamphetamine.   Agents also followed EHSO and HERNANDEZ (traveling together in the same car) after they made the methamphetamine delivery to CHANEY.  ESHO and HERNANDEZ drove directly from the CHANEY's hotel to the residence of Jesus Alfredo RAMIREZ, aka "Chuy," located at 6690 Doriana Street, Apartment 33, San Diego, California 92139.

26.    The fact that ESHO and HERNANDEZ traveled directly to RAMIREZ's house after delivering the 4 pounds of methamphetamine to CHANEY leads me to believe that RAMIREZ was the source of the methamphetamine sold to CHANEY. Indeed, during an intercepted conversation prior to the sale CHANEY informed HERNANDEZ that he had "10 on me right now [$10,000 in cash to pay for the

methamphetamine]." HERNANDEZ stated that would be enough, noting that CHANEY was "good for it [would come through later with the rest of the purchase money]." Thus, ESHO and HERNANDEZ had $10,000 in cash following the deal, which they would inevitably want to immediately use to pay off the source of supply, RAMIREZ, rather than risk somehow losing the money and becoming indebted to RAMIREZ.[2]

### Quarter-Pound Methamphetamine Seizure on May 27, 2018

27. On May 27, 2018, Jose HERNANDEZ was driving his car in Chula Vista. Chula Vista Police Department Officer Zimmer attempted to conduct of traffic stop of HERNANDEZ's vehicle (on the Officer's own initiative, not at the request of agents handling this investigation). Rather than pull over, HERNANDEZ led Officer Zimmer on a high-speed chase, which Officer Zimmer ultimately abandoned due to public safety concerns. Intercepted calls to and from HERNANDEZ following the incident revealed that HERNANDEZ had thrown a bag containing a half-pound of methamphetamine out of his car during the chase. HERNANDEZ gave a detailed description of the bag and the location where he had thrown it out of his car. Using that information, law enforcement officers were able to locate the bag and seize what amounted to a quarter-pound of methamphetamine.

28. If law enforcement had not been able to locate the quarter-pound of methamphetamine HERNANDEZ threw out of his car, it is likely that co-conspirator David GAUTREAU would have found it and returned to the HERNANDEZ. Indeed, during a call from HERNANDEZ to David GAUTREAU, HERNANDEZ stated, "look I got in a high speed chase yesterday fool, I need somebody to go see if they can find

---

[2]     Intercepted calls have confirmed that RAMIREZ is a methamphetamine source of supply utilized by HERNANDEZ and ESHO. For example, on June 20, 2018, Fady ESHO used Target Telephone #3 to place a call to Jorge GONZALEZ. During the call, ESHO stated that "Chuy" [Jesus RAMIREZ] had "given him a lot" [supplied him with a significant quantity of methamphetamine]. ESHO asked if GONZALEZ "wanted anything." GONZALEZ replied, "well . . . you owe me a qp [a quarter-pound of methamphetamine]." ESHO stated, "besides that . . . do you want anything over that?" GONZALEZ replied, "yeah." ESHO confirmed and stated, "I'll bring it to you."

my shit . . . you're on the 5 freeway and you're getting on the 54, you take the turn and there's another lane coming from our right hand side coming from E street, right as you go underneath that overpass, I threw it's in a black Versace hygiene bag, close to half a pound." HERNANDEZ continued, "it was like 3 or 4 in the morning . . . I threw it right there cuz there were a lot of cars in the back it was a high speed chase and I had to turn my lights off so it was pitch dark when I threw it . . . they [the police] couldn't have seen it I was too far ahead of them." GAUTREAU replied that he would take an Uber and "go check right now."

29.    As GAUTREAU was looking for the bag containing methamphetamine near the 5 freeway he placed a call to HERNANDEZ. During the call, GAUTREAU stated, "I'm here doggie I'm here right now man there's so much fucking place to check . . . like there's bushes and shit so I don't know exactly where you was at." HERNANDEZ instructed GAUTREAU to look "right there underneath the, underneath the overpass." The call was then cut short when GAUTREAU reported to HERNANDEZ that the "cops are talking to ugh, Uber right now."

30.    About forty-five minutes later, GAUTREAU called HERNANDEZ back. GAUTREAU stated that, "we just got sweated by the cops big time . . . they pulled up deep five patrol cars and they asked if I was trying to kill myself." GAUTREAU explained that he had brought Lynn LNU with him and they told the police they were "looking for her ring." In a subsequent call later that same day, GAUTREAU suggests that HERNANDEZ get a "Tile" device to put in future bags so HERNANDEZ would "be able to find it anywhere."[3]

---

[3]    In addition to the attempted recovery of the methamphetamine HERNANDEZ threw out the window of his car, intercepted calls have confirmed that GAUTREAU is involved in distributing methamphetamine. For example, on May 30, 2018, ESHO called HERNANDEZ and stated that he was traveling to San Bernadino and asked if HERNANDEZ wanted to go along or stay and "sell some bags" [sell methamphetamine]. HERNANDEZ opted to stay, and told ESHO that, "I need to make some money." Later that day, ESHO called HERNANDEZ and asked HERNANDEZ to cover for him while he was in San Bernadino, and instructed HERNANDEZ to "give David [GAUTREAU, aka "Devil"] 2 for 3" [sell GAUTREAU 2 ounces of methamphetamine for $300]. ESHO also mentioned several other methamphetamine customers who would be contacting HERNANDEZ, including "Lance," "the Caldean guy" and "Junior." In a follow-up call,

## Quarter Pound Methamphetamine Seizure on August 27, 2018

31. To fill a customer's order, GONZALEZ placed a call to RAMIREZ, his methamphetamine source of supply, [I know the purpose of the call because GONZALEZ told the individual that he would be trying to get at "his guy," that is, his methamphetamine source of supply]. During the call, GONZALEZ informed RAMIREZ that he had "900" [$900 to purchase methamphetamine] and asked if he could "come by" [go to RAMIREZ's residence – and pick up some methamphetamine]. RAMIREZ explained that he was currently in Tijuana but that his "son would be home around 2:40" and instructed GONZALEZ to give the money to "Junior" [RAMIREZ's son]. GONZALEZ confirmed that he would "be there" at 2:40.

32. Law enforcement officers established surveillance at RAMIREZ's residence. At 4:04 p.m., GONZALEZ arrived in the parking lot of the apartment complex, got out of his vehicle and entered **the residence empty** handed. At 4:11 p.m., GONZALEZ walk out of the front door of **the residence** carrying a Hollister shopping bag. A teenage male was seen at the entrance to the residence.

33. GONZALEZ was followed back to his residence. Upon arriving, he placed a call to his customer and requested that they come to his residence and obtain the product.

34. Eventually, surveillance agents observed the individual arrive at GONZALEZ's residence and obtain a black backpack. A subsequent traffic stop of the individual's vehicle resulted in the seizure of a ¼ pound of methamphetamine from her purse.

## Arrest of HERNANDEZ and seizure of Target Telephone-1

35. On August 18, 2018, HERNANDEZ received a phone call from Jorge GONZALEZ who stated his desire to purchase a "whole unit" [pound of methamphetamine] from HERNANDEZ. HERNANDEZ informed GONZALEZ that he only have "two zips left." The two continued discussing pricing for various quantities

---

HERNANDEZ confirmed that "Devil" [David GAUTREAU] and "Lance" LNU had picked up methamphetamine.

of methamphetamine during the conversation. On August 20, 2018 at approximately 9:52 P.M., HERNANDEZ arrived at the residence of GONZALEZ. At approximately 11:18 P.M, HERNANDEZ entered his vehicle and left GONZALEZ's residence. Based on prior information known to law enforcement, a traffic stop was initiated. Rather than yield, HERNANDEZ fled the officers at a high rate of speed, forcing them to engage in a high speed pursuit. The pursuit reached speeds well over 100 MPH, and lasted for over one hour. Ultimately, HERNANDEZ was taken into custody and **Target Telephone-1** was recovered from the vehicle.

36.   Based on the intercepted calls between HERNANDEZ and GONZALEZ, the surveillance observations of HERNANDEZ arriving at GONZALEZ's residence after communicating about the distribution of narcotics, and prior law enforcement interceptions of HERNANDEZ, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-1**.

### Arrest of RAMIREZ and seizure of Target Telephone-2 through 7

37.   On September 20, 2018, RAMIREZ was arrested at his residence located at 6690 Doriana Street #33, San Diego, CA during the execution of a federal search warrant signed by the Honorable Nita L. Stormes, United States Magistrate Judge. **Target Telephones-2,3,4,5,6, and 7** were all seized from RAMIREZ's residence during the execution of the warrant. Specifically, **Target Telephone-2** was found on the nightstand in RAMIREZ's bedroom, during the search of the residence RAMIREZ's spouse provided **Target Telephone-2** was used by RAMIREZ. **Target Telephone-3** was found in the living room on the couch, family members indicated this phone was used by RAMIREZ's 18 year old son. During RAMIREZ's interview after his arrest, RAMIREZ indicated his son would receive money for RAMIREZ and provide packages to customers when RAMIREZ was in Mexico. **Target Telephone-4** was found in the common area living room between couches and **Target Telephone-5** was found in the common area living room under a couch. **Target Telephone-6** was found in a storage cabinet off the bathroom. **Target Telephone-7** was found in the common area dining room on the table.

38.     Based on my training and experience, I know that it is common for narcotics distributors to possess multiple cellular telephones in which they store content and make calls related to narcotics distribution. Additionally, based on the intercepted calls between GONZALEZ and RAMIREZ, the surveillance observations of GONZALEZ arriving at and departing RAMIREZ's residence prior to the August 27, 2018 traffic stop; the evidence items located during the traffic stop and the prior law enforcement intercepts of RAMIREZ's involvement as a source of supply of methamphetamine, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-2, Target Telephone-3,** and **Target Telephone-4, Target Telephone-5, Target Telephone-6, and Target Telephone-7.**

### Arrest of GAUTREAU and seizure of Target Telephone-8

39.     On September 19, 2018, GAUTREAU was arrested by Sycuan Tribal Police. A record check was conducted and reflected an outstanding arrest warrant signed by the Honorable Nita L. Stormes, United States Magistrate Judge. **Target Telephone-8** was all seized from GAUTREAU during the execution of the warrant.

40.     Based on my training and experience, I know that it is common for narcotics distributors to constantly engage in their narcotics distribution utilizing multiple cell phones. Furthermore, given the nature of the investigation and the magnitude of the methamphetamine distribution, I believe that GAUTREAU and others were still engaged in the distribution of narcotics up until the date of their arrest. That, coupled with the intercepted calls between GAUTREAU and HERNANDEZ lead me to believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-8.**

### TARGET TELEPHONE-9

41.     During the course of this investigation, Christopher RISDON suspected user of **Target Telephone-9** was arrested at his residence during the execution of a state search warrant (#58099) issued by California Superior Court Judge Esteban Hernandez for his residence. **Target Telephone-9** was seized from RISDON's residence that same day.

## 10 oz. Methamphetamine Seizure on August 28, 2019

42.     On August 28, 2018, a search warrant was executed at the home of Christopher RISDON, 1333 ½ Helix, Spring Valley, California.  The warrant was based on a series of intercepted calls which indicated that RISDON had obtained methamphetamine from GONZALEZ.  Approximately 15 grams of methamphetamine, which was packaged for distribution, was recovered from inside RISDON's bedroom. A handgun was recovered from inside RISDON's mother, Maria RISDON's, bedroom under her mattress.  When agents asked RISDON's mother why there was a gun in her room, she stated, "Chris put the gun there, evidently."  When asked whose DNA would be found on the gun, Maria RISDON responded, "probably mine and Chris'."

43.     Prior to the execution of the above-noted search warrant, law enforcement officers conducted surveillance at the residence of RAMIREZ because intercepted calls indicated that GONZALEZ would be going to that location to pick up methamphetamine on August 21, 2018.  Consistent with those intercepted calls, agents observed GONZALEZ enter RAMIREZ's residence and leave shortly thereafter carrying two bags on August 21, 2018.  As he left RAMIREZ's residence GONZALEZ placed a call to RISDON.  During the call, GONZALEZ stated that he had just picked up a quantity of methamphetamine and asked if he could "weigh it over there [at RISDON's house]."  GONZALEZ stated that he could provide RISDON with "another two" [an additional 2 ounces of methamphetamine].  GONZALEZ complained that he didn't "have his gun on him," but RISDON assured GONZALEZ that he was armed and would make sure GONZALEZ "made it out of that place."

44.     Based on the intercepted calls between RISDON and GONZALEZ, the seizure of narcotics, a firearm and various indicia of sales after communicating about the distribution of narcotics, and prior law enforcement interceptions of GONZALEZ, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-9**.

15

**TARGET TELEPHONE-10**

45.     During the course of this investigation, Sergio SANCHEZ "Shaggy" suspected user of **Target Telephone-10**, was arrested for being a felon in possession of a firearm and ammunition.

46.     Specifically, on June 13, 2018, agents participating in this investigation were conducting a court-authorized wiretap on a telephone being used by Fady ESHO. Intercepted communications indicated that ESHO, accompanied by SANCHEZ, and Jose HERNANDEZ, were conspiring to assault, using dangerous weapons, an individual on behalf of the Mexican Mafia.[4]  A traffic stop of EHSO's vehicle resulted in the seizure of 4 firearms and zip ties, which were to be used in assaulting, intimidating and restraining the intended victim.  SANCHEZ and HERNANDEZ were passengers in ESHO's vehicle at the time of the stop.  Some of the intercepted communications regarding that event are set forth below.

47.     On June 12, 2018, ESHO received an incoming call from an individual identified as Luciano Rivera, aka "Chano."  Rivera is a well-known Mexican Mafia associate who is currently serving a life sentence at Calipatria State Prison in California. Rivera used a contraband cellular telephone to place the call to ESHO.  During the call, Rivera complained that "Grizzly from fucking Palm City [identified as Chris Villanueva]" had "come up on Boo's ex-wife . . . my homegirl 'Tweety' [a woman identified as Michelle Salas] . . . and took her laptop and all kind of shit."  In retaliation for that act, Rivera instructed ESHO to "get 'Shaggy' [Sergio SANCHEZ] and all the fellas . . . to go over there and sack him [perform an unspecified violent act on 'Grizzly' to retaliate for what he did to Michelle Salas, aka "Tweety"].

48.     On June 12, 2018, Rivera placed another call to ESHO and asked if ESHO was "with the homies."  EHSO replied, "yeah."  Rivera instructed ESHO and the

---

[4]     The Mexican Mafia is an association-in-fact enterprise as that term is defined in Title 18, United States Code, Section 1961(4).  See United States v. Martinez, 657 F.3d 811, 815 (9th Cir. 2011) (discussing the nature and characteristics of the Mexican Mafia which make it a "racketeering enterprise" under the RICO statute).

"homies" [later determined to be SANCHEZ and HERNANDEZ] to go "strapped up" [armed with guns] to "take this fool's shit" [a reference to Chris Vallanueva, aka "Grizzly"]. ESHO replied, "okay." ESHO then handed the phone to HERNANDEZ, who continued the conversation with Rivera. Rivera told HERNANDEZ that "we're taking this fool's shit for Boo Boo, dog" ["Boo Boo" was a reference to Mexican Mafia member Luis Garcia]. Regarding the whereabouts of the intended victim, who was referenced during the call as "Grizzly from Palm City," HERNANDEZ stated, "I know exactly where he lives . . . I know exactly who he is." Rivera instructed HERNANDEZ to "just . . . put . . . put him on the floor, fool, take his shit." HERNANDEZ replied, "I got you boy." Rivera responded, "Okay. Gracia boy. Appreciate that. Call me when you get there."

49. ESHO then had a final conversation with Rivera before law enforcement officers stopped his vehicle. During the call, ESHO informed Rivera that "we're on the way." Rivera reminded ESHO to "just put them all . . . like . . . like at gun point, and put them all on the floor, fool . . . just take their shit boy." Rivera stated that ESHO and his crew "should come up on like 30 grand [be able to rob Grizzly of at least $30,000 worth of property]." ESHO replied, "should I take more people or just three of us?" Rivera responded, "just you guys, that's all you guys need." ESHO assured Rivera that he was "packing . . . I'm packing hard" [a reference to the fact that ESHO, SANCHEZ and HERNANDEZ were all armed]. Rivera reminded ESHO that, "you guys are coming up right here, this is for the senior Boo Boo" [assuring ESHO that the "work" he was about to put in was on behalf of Mexican Mafia member Luis Garcia, aka "Boo Boo," and that his contribution would be duly recognized by the enterprise].

50. SDPD Gang Suppression Officers successfully stopped the Hummer. ESHO was identified as the driver of the vehicle. Jose HERNANDEZ was identified as the front passenger. Sergio SANCHEZ was identified as the rear passenger. A records check revealed that both HERNANDEZ and SANCHEZ were on active California state probation. ESHO was carrying a loaded Sig Saur .40 caliber handgun

1  in a concealed holster on his waist, along with two filled magazines in separate holsters.

2  ESHO also had multiple zip ties in his rear pants pocket.  A search of the Hummer

3  resulted in the seizure of an additional three firearms, all of which were loaded:  a Ruger

4  9mm handgun was located between the front passenger seat and the console; a Smith

5  and Wesson 9mm handgun was located in a black bag in the rear seat; and a Ruger .22

6  caliber revolver was located under the driver's floor mat.

7  51.   **Target Telephone-10** was seized from SANCHEZ on August 25, 2018

8  during his arrest for an outstanding felony probation warrant. On that date, SANCHEZ was

9  identified during a traffic stop as an individual on probation, when SDPD Officers

10  contacted Probation they were informed there was a pending warrant for SANCHEZ's

11  arrest and he was taken into custody. **Target Telephone-10** was on SANCHEZ's person

12  when he was taken into custody. SANCHEZ provided he was staying in a nearby hotel,

13  SDPD noted a hotel key card and checked with the hotel and found a room was registered

14  in his name. A fourth waiver search was conducted of the hotel room, a female was present

15  in the room, a .25 caliber pistol was found in a purse in the room and several loose rounds

16  and a nylon holster were found in a black gym bag. A small quantity of methamphetamine

17  was also found in the room.

18  52.   Based on the intercepted calls between ESHO and RIVERA, the seizure of

19  several firearms after communicating about a violent act, and a seizure of an additional

20  firearm, I believe that evidence of crimes as described in Attachments B will be found

21  on **Target Telephone-10**.

22  **TARGET TELEPHONES-11 AND 12**

23  53.   During the course of this investigation, Robert WELSH suspected user of

24  **Target Telephone-11 and 12**, was arrested after two hundred and twenty eight firearms,

25  including fully automatic machineguns, were seized from his property along with small

26  quantities of narcotics. Below are various examples of conduct law enforcement

27  successfully intercepted.

28

54.    On June 25, 2018, while agents were monitoring ESHO's cell phone, he engaged in conversations with WELSH about an AR-15 assault style rifle and exchange of controlled substances. Specifically, ESHO wanted to provide WELSH an additional $200 for what monitoring agents believed to be a Springfield XD handgun. *Id.* at 8. WELSH re-negotiated the price of the AR-15 since it required more parts than he originally expected. Id. ESHO explained to WELSH he already paid $400 and a half ounce (agents believe this to be methamphetamine) totaling $550 worth of goods. WELSH agreed ESHO had already given him a half ounce worth $150 and agrees to settle the negotiation. *Id*.

55.    On July 6, 2018 San Diego District Attorney's Office Investigator ("DAI") David Collins obtained a search warrant signed by California Superior Court Judge Runston G. Maino to search WELSH's residence at 11840 Wildcat Canyon Road, Lakeside, California. This search warrant was executed on July 16, 2018. Items received during the execution of the search warrant included approximately two-hundred and twenty-eight firearms, ammunition, a bulletproof vest, firearm parts, magazines, a Samsung cellular telephone, cash, physician letters, one computer tower, two drill presses, and various controlled substances.

56.    On July 16, 2018, San Diego County Sheriff's Special Enforcement Division executed a state search warrant for Robert WELSH's residence located at 11840 Wildcat Canyon Road in Lakeside, California. After securing the location and announcing their presence, deputies encountered WELSH and his wife in their residence. Both were advised of the search warrant and were told that no arrests would be conducted that morning.

57.    A search of WELSH's residence revealed multiple gun safes in various locations within the home, a total of two hundred and twenty eight (228) firearms, multiple high capacity magazines including a 50-round drum magazine, several firearm silencer devices, a "Glock switch" device that converts a semi-automatic pistol into an automatic pistol, and multiple cases ammunition.

58.     Specifically, the Colt, model AR-15 SP1, .223 caliber short-barrel rifle, bearing serial number SP162030, was recovered from a gun safe in WELSH's bedroom. The Colt, model AR-15 A2, .223 caliber semi-automatic rifle, from which the manufacturer's serial number had been removed, altered and obliterated was recovered from a separate room next to WELSH's bedroom that was dedicated to the storage of several additional firearms, ammunition and holsters. **Target Telephone-11** was seized from WELSH's residence during the execution of the search warrant.

59.     WELSH could not state how many weapons and much ammunition he was in possession of.  All firearms were seized and inspected by a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives who has training and experience identifying firearms. That Special Agent conducted a preliminary field test of the Colt, model AR-15 SP1, .223 caliber short-barrel rifle, bearing serial number SP162030, which indicated that it functioned as a machinegun. The agent also conducted a visual examination of Colt, model AR-15 A2, .223 caliber semi-automatic rifle and confirmed that it had an obliterated serial number. All firearms were seized and WELSH was not arrested at that time.

60.     On September 17, 2018, WELSH was arrested pursuant to an arrest warrant signed by the Honorable Mitchell D. Dembin, United States Magistrate Judge. **Target Telephone-12** was seized from WELSH at that time.

61.     Based on my training and experience, I know that it is common for narcotics and firearms distributors to possess multiple cellular telephones in which they store content and make calls related to narcotics and firearms distribution. In light of the overwhelming amount of firearms seized from WELSH, I believe that the phone he possessed during his arrest will contain evidence of illegal firearms possession or trafficking. Additionally, based on the intercepted calls between ESHO and WELSH regarding the exchange of narcotics for firearms, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-11 and 12.**

20

**TARGET TELEPHONES-13 THROUGH 15**

62.    During the course of this investigation, Fernando ALATORRE suspected user of **Target Telephone-13, 14, and 15**, was intercepted coordinating the sale of narcotics with a known multi-pound level methamphetamine distributor. Below are various examples of conduct law enforcement successfully intercepted.

63.    On September 7, 2018, at approximately 3:50 A.M., La Mesa Police Department ("LAPD") officers observed Fernando Alatorre swerving several times near the 7900 block of El Cajon Boulevard. Shortly after, ALATORRE turned into a parking lot of a closed business and parked. The officers followed ALATORRE into the parking lot and parked their marked patrol car near ALATORRE's vehicle without blocking him. The officer's contacted ALATORRE and informed him of their observations. ALATORRE apologized and admitted that he was using his cell phone. When asked if he was the registered owner of the vehicle, ALATORRE stated that he was. ALATORRE also provided a California Identification Card to the officers. A records check confirmed that ALATORRE was 1) the registered owner of the vehicle and 2) resided at 4075 Kansas Street, San Diego, CA 92105.

64.    During the course of the conversation, ALATORRE informed the officers that he was in possession of methamphetamine. ALATORRE handed a small jar containing a white crystalline substance, which had a net weight of approximately 5.5 grams and field-tested positive for methamphetamine.

65.    During a search of the vehicle incident to arrest, officers located a glass pipe with a bulbous end and white residue, approximately $2,300 of fraudulent U.S. currency, and a Heritage Rough Rider .22 caliber revolver. The revolver, which was located in a backpack in the trunk of the vehicle, appeared to have a serial number that was destroyed and altered. The revolver was loaded with 6 rounds of .22 caliber ammunition. As ALATORRE watched the officers locate the revolver he spontaneously stated that, "a friend gave that to me." A further search of the backpack yielded an additional 138 rounds of .22 caliber ammunition from inside the backpack.

21

66.   A records check of ALATORRE's criminal history revealed that he was convicted of a felony violation of California Penal Code section 12020(a) – Unlawful Possession/Manufacturing/Selling of a Dangerous Weapon, in 1998. ALATORRE was subsequently placed under arrest by the officers and transported to San Diego County Jail.

67.   Within four days of his arrest, ALATORRE (who had by then been released from custody) received a phone call from GONZALEZ, a known multi-pound seller of methamphetamine, who was the subject of a court authorized wiretap. During the recorded conversation, GONZALEZ asked ALATORRE if he still had the revolver. ALATORRE informed Gonzalez of his arrest and the confiscation of the revolver. ALATORRE then pressed Gonzalez for background information on the revolver, mainly, if the revolver "got anything on there" [had a history of being used in violent crime or was stolen] or not so that he could prepare himself for his case. ALATORRE further explained to Gonzalez that the gun was located in the trunk and the narcotics were in the front of the car.  Gonzalez tried to comfort ALATORRE by telling him that it was better that the gun and drugs were not next to each other because "they" [law enforcement] frown upon that.

68.   ALATORRE then shifted the conversation and informed GONZALEZ that he needed some more "work" [methamphetamine] and that he "was getting a half fool, so let me get a quarter or something." GONZALEZ told ALATORRE that he would charge him "for the quarter and you just pay me back…I'll front you the other half…the half of a half or something" so that ALATORRE would have half-pound of methamphetamine to sell. ALATORRE replied, "I gotta unload it and make some fuckin money bro…"

69.   ALATORRE was subsequently arrested at his residence pursuant to a federal arrest warrant signed by the Honorable Nita L. Stormes, United States Magistrate Judge. **Target Telephone-13, 14, and 15** were seized from ALATORRE's residence. **Target Telephone-13** was seized in the dining room common area in a

plastic tool box sitting on the floor, also found in the tool box was a broken pipe with residue. **Target Telephone-14 and Target Telephone-15** were found in the common living room area.

70.     Based on my training and experience, I know that it is common for narcotics distributors to possess multiple cellular telephones in which they store content and make calls related to narcotics distribution. Additionally, based on the intercepted calls between GONZALEZ and ALATORRE, the traffic stop of ALATORRE in which narcotics, a firearm, and ammunition were found, and the ongoing nature of the identified narcotics distribution of GONZALEZ, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephones-13 through 15.**

## **TARGET TELEPHONES-16, 17**

71.     During the course of this investigation, Aimee CHAVIRA suspected user of **Target Telephone-16**, and Veronica OJEDA suspected user of **Target Telephone-17** were recorded during a controlled narcotics transaction with a confidential source.

72.     Specifically, on November 8, 2017, a confidential informant (CI) conducted a "controlled purchase"[5] of four ounces of methamphetamine from Veronica OJEDA and Aimee CHAVIRA for $600.    The CI surreptitiously audio and video recorded the methamphetamine purchase. The four ounces of methamphetamine obtained by the CI was

---

[5]     I use the term "controlled purchase" to describe a specific investigative technique which involves that use of an informant or cooperating individual (jointly referred to as "informant" for purposes of this description) to purchase narcotics from an identified person. To set up the drug transaction, the informant will typically make a recorded and/or monitored telephone call to the drug distributor being targeted. Based on the arrangements made during that telephone call, the informant will then travel, accompanied by law enforcement officers, to a location near where the deal is supposed to take place. The person and the vehicle of the informant is then searched by law enforcement officers to ensure that he/she is not in possession of any contraband and/or money. The informant is then given money to purchase the drug and is followed to the transaction site by surveillance officers.  To the extent possible, law enforcement officers will attempt to observe the narcotics sale take place. Immediately following the sale, the informant is followed back to a predetermined location where the person and vehicle of the informant is once again searched by law enforcement officers to ensure that he/she is not in possession of any contraband (other than the drugs just purchased from the targeted individual) and/or money.

submitted to the DEA Southwest Laboratory for analysis and was determined to contain 109 grams of pure methamphetamine. Some of the details surrounding that methamphetamine sale are set forth below.

73.   From 12:03 p.m. to 2:32 p.m., the CI exchanged a series of text messages with Veronica OJEDA, wherein OJEDA agreed to meet the CI at specific business's parking lot on Sweetwater Road in Spring Valley, California, at 3:00 p.m. to conduct a methamphetamine transaction. A specific amount of methamphetamine was not discussed during the text exchange, but was presumed to be 4 ounces of methamphetamine since the CI had previously conducted a "controlled purchase" of that amount from OJEDA and CHAVIRA on October 12, 2017.

74.   Agents established surveillance at the residence of OJEDA, 853 Bonsall Street, San Diego, California. At 2:30 p.m., CHAVIRA arrived at OJEDA's house driving a white Toyota Tundra with CA license plate LAFORY5, registered to Angelica CHAVIRA, 205 E 31st Street, National City, California. CHAVIRA got out of the truck and walked into OJEDA's residence. At 2:48 p.m., CHAVIRA and OJEDA walked out of OJEDA's residence, got into CHAVIRA's truck and departed the area. CHAVIRA was driving the truck.

75.   At 2:52 p.m., agents observed CHAVIRA's truck arrive at the pre-arranged parking lot on Sweetwater Road. Both the driver's and passenger's windows were rolled down. At 2:59 p.m., OJEDA placed a call the CI and stated that she was in a "white truck." At 3:00 p.m., the CI pulled up next to the truck. OJEDA got out of the truck and into the passenger side of the CI's vehicle.

76.   While in the CI's vehicle, OJEDA removed the methamphetamine from her purse and gave it to the CI. The CI then provided OJEDA with $600. OJEDA explained that she had to "give her [CHAVIRA] the money so that she can do the rest" [pay the source of supply for the methamphetamine]. OJEDA the took the $600, got out of the car and gave it to CHAVIRA, which was captured on the CI's surreptitious video camera and observed by agents conducting surveillance. When OJEDA returned to the CI's vehicle,

24

1  the CI stated that he/she knew CHAVIRA and that the CI had purchased methamphetamine

2  from her in the past.  OJEDA replied that CHAVIRA was her "cousin" because CHAVIRA

3  "had a baby with someone in my dad's family."  The CI asked if CHAVIRA was OJEDA's

4  "plug" [source of supply].  OJEDA stated that she was not and that her "plug" was her

5  [OJEDA's] father, who lived in "TJ" [Tijuana, Mexico].

6    77.  **Target Telephone 16** was seized from CHAVIRA on September 20, 2018

7  during the execution of a federal arrest warrant signed by the Honoroable Nita L. Stormes,

8  United States Magistrate Judge.

9    78.  **Target Telephone 17** was seized from OJEDA on September 19, 2018 during

10  the execution of a vehicle stop and arrest by San Diego Sheriff's Office.

11    79.  Based on my training and experience, individuals participating in the sale of

12  narcotics maintain contacts with others conducting the same or similar criminal activity for

13  years and keep this contact information in their cellular phones. Additionally, I am aware

14  many individuals save photos, texts, or notes in their phone history for extended periods of

15  time and these photos, texts, and notes may contain information about prior narcotics

16  transactions.

17  **TARGET TELEPHONE-18**

18    80.  During the course of this investigation, Alan ROHRBACK "AJ", suspected

19  user of **Target Telephone-18**, was intercepted coordinating large narcotics transactions

20  with GONZALEZ. Below are various examples of conduct law enforcement successfully

21  intercepted.

22    81.  On August 16, 2018, ROHRBACK," placed a call to GONZALEZ. During

23  the call, GONZALEZ stated that we was "trying to get some work right now [trying to

24  obtain methamphetamine], I got people waiting for that stuff."  GONZALEZ then asked if

25  ROHRBACK could do "a whole elbow of it [a pound of methamphetamine] or just half of

26  it [a half-pound of methamphetamine]."  ROHRBACK replied, "yeah, half of a key" [500

27  grams].  GONZALEZ stated, "that's like one pound, one ounce."  ROHRBACK replied,

28  "it's like 18 ounces."  GONZALEZ then stated, "you have my number now, if you have

work for me, I move it [GONZALEZ would sell any methamphetamine that ROHRBACK could supply]." ROHRBACK replied, "I can find you QP [a quarter-pound of methamphetamine] right now . . . for 550 [$550]." GONZALEZ stated, "that's no problem, I can do that, I'm used to moving like five at a time [selling five pounds of methamphetamine at a time], picking up five at a time, just like that, that's no problem." ROHRBACK told GONZALEZ that he would "go pick up this QP and then I'll slide over there [to deliver the methamphetamine to GONZALEZ]." GONZALEZ said he would "text the address." Following the phone call, GONZALEZ sent a text message to ROHRBACK: "1415 Skyline dr. Lemon grove" [GONZALEZ's address before he moved into the RV]. ROHRBACK replied, "On my way!" About 5 hours later, GONZALEZ sent a text message to ROHRBACK: "Sup aj it's me lonely I got your $ wanted to see what else u got for me maybe [confirming that he had already sold the quarter pound of methamphetamine delivered earlier by ROHRBACK and requesting additional methamphetamine]." ROHRBACK replied, "Alright hell yea I got you."

82. On August 18, 2018, GONZALEZ placed a call to ROHRBACK. During the call, GONZALEZ stated, "I just about got all your money, I almost had it all yesterday . . . let me see what I have real quick, do you have any more work?" [confirming the prior methamphetamine was "fronted" to GONZALEZ and then asking if ROHRBACK had any additional methamphetamine to sell]. ROHRBACK replied, "yeah, I got some work."

83. On September 20, 2018, ROHRBACK was arrested, and **Target Telephone-18** seized from inside ROHRBACK's residence during the execution of a federal search and arrest warrant signed by the Honorable Nita L. Stormes, United States Magistrate Judge. During the execution of that warrant agents found several narcotics, scales, firearms, and other indicia of a large scale narcotics distribution business.

84. Based on my training and experience, I know that it is common for narcotics distributors to possess multiple cellular telephones in which they store content and make calls related to narcotics distribution. Additionally, based on the intercepted calls between GONZALEZ and ROHRBACK, and the seizure of narcotics and firearms

1   at the residence of ROHRBACK, I believe that evidence of crimes as described in

2   Attachments B will be found on **Target Telephone-18.**

3

4   ### TARGET TELEPHONES-19, 20

5       85.    During the course of this investigation, Sara Beamer suspected user of **Target**

6   **Telephone-19 and 20**, was intercepted coordinating the distribution of narcotics with

7   various individuals. Below are various examples of conduct law enforcement successfully

8   intercepted.

9       86.    On May 30, 2018, Sara BEAMER placed a call to HERNANDEZ. During

10  the call, HERNANDEZ told BEAMER that he was at the Best Western on Mollison

11  and that BEAMER can "come to him" [come pick up methamphetamine from him at

12  the motel].  BEAMER responded that she had 120 [$120] and she needed "more than a

13  half so she could make up the money" [HERNANDEZ should provide her with more

14  than a half-ounce of methamphetamine so BEAMER could make more money reselling

15  the drugs].  BEAMER stated that she had "someone with $80 that is waiting on her" [a

16  methamphetamine customer looking to purchase $80 worth of drugs] but that she did

17  "not have enough to take care of them [did not have enough methamphetamine on hand

18  to make the sale]."   BEAMER then stated she wanted "a half and an 8-ball" [a half-

19  ounce plus and "8-ball," that is, an eighth of an ounce of methamphetamine].

20      87.    The next day, BEAMER send a text message to HERNANDEZ stating

21  "did you get more [methamphetamine] yet?"  Of note is that when HERNANDEZ

22  received this text message, the GPS location of his phone was at the residence of Jesus

23  RAMIREZ, aka "Chuy," a methamphetamine source of supply utilized by

24  HERNANDEZ.  HERNANDEZ responded by placing a call to BEAMER.  During the

25  call, HERNANDEZ stated he was going back to the Best Western and that he would

26  talk to BEAMER once he got there. BEAMER waited until the next day – June 1, 2018

27  – to call HERNANDEZ back. During the call, HERNANDEZ stated he was still at the

28  Best Western and that he "had some [methamphetamine]."  BEAMER ordered a "half"

1  [half-ounce of methamphetamine] and stated she would "flip it" [resell the half-ounce
2  of methamphetamine quickly]." BEAMER said she could "come over there right now."
3  HERNANDEZ replied, "alright."

4      88.   On June 2, 2018, Sara BEAMER placed a call to HERNANDEZ on Target
5  Telephone #1. During the call, BEAMER ordered "50 for right now" [$50 worth of
6  methamphetamine] and that she would then "come back for an ounce" [return later to
7  obtain a whole ounce of methamphetamine]. HERNANDEZ told her to "slide through
8  then" [come over and pick up the methamphetamine]. BEAMER replied, "okay."

9      89.   On September 13, 2018, BEAMER was arrested on an outstanding warrant
10 for credit card fraud. A search of her pursue resulted in the seizure of a half-ounce of
11 methamphetamine and a scale. BEAMER's possession of a scale along with a quantity
12 of methamphetamine suitable for distribution is consistent with her role as a
13 methamphetamine distributor, as established during communications intercepted in this
14 case. **Target Telephone 19** and **20** were also seized from BEAMER during her arrest.

15     90.   Based on my training and experience, I know that it is common for
16 narcotics distributors to possess multiple cellular telephones in which they store content
17 and make calls related to narcotics distribution. Additionally, based on the intercepted
18 calls between HERNANDEZ and BEAMER, and the seizure of narcotics and indicia of
19 narcotics sales, I believe that evidence of crimes as described in Attachments B will be
20 found on **Target Telephone-19** and **20.**

21
22                    **CELL PHONE SEARCH METHODOLOGY**
23     91.   It is not possible to determine, merely by knowing the cellular telephone's
24 make, model and serial number, the nature and types of services to which the device is
25 subscribed and the nature of the data stored on the device. Cellular devices today can
26 be simple cellular telephones and text message devices, can include cameras, can serve
27 as personal digital assistants and have functions such as calendars and full address books
28 and can be mini-computers allowing for electronic mail services, web services and

rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must examine the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

92.    Following the issuance of this warrant, FBI will collect the subject cellular telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards, call detail records, and deleted files will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

93.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

29

1

## CONCLUSION

2    94.    Based on the foregoing, I believe there is probable cause to believe items

3   that constitute evidence of violations of federal criminal law, namely, of Title 21, United

4   States Code, Sections 841, 846, and 843, and Title 18, United States Code, Sections

5   922(g)(1) and 922(a)(1)(A) (Felon in Possession of Firearm), described in **Attachment**

6   **B**, will be found in the property to be searched, as provided in **Attachments A-1** through

7   **A-20**.

8

9

10                                              Nicole Martin
                                                FBI Special Agent
11

12   SUBSCRIBED and SWORN to before me

13   this _____ day of February, 2019

14

15   _____
     HON. WILLIAM V. GALLO
16   United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A-3
## CELLULAR PHONE TO BE SEARCHED

iPhone White with black case (**Target Telephone-3**).

**Target Telephone-3** is currently being held as evidence in the Southern District of California.





### ATTACHMENT B
### ITEMS TO BE SEIZED

Authorization to search the cellular phones described in Attachments A-1 through A-20 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephones shall be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of **September 1, 2017** to and including **the date the cellular phone was seized by law enforcement**:

   a. tending to identify efforts to obtain, possess, distribute, or sell firearms and/or methamphetamine, or some other controlled substances;

   b. tending to identity accounts, facilities, storage devices, and/or services-such as email addresses, IP addresses, and phone numbers-used to facilitate the smuggling and distribution of methamphetamine, or some other controlled substance and firearms;

   c. tending to identify co-conspirators, criminal associates, or others involved in firearms trafficking or smuggling and distribution of methamphetamine, or some other controlled substance;

   d. tending to identify travel to or presence at locations involved in the smuggling and distribution of methamphetamine or some other controlled substance or firearms, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Telephones-1 through 20; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846, and 843 and Title 18, United States Code Sections 922(g) and 922(a)(1)(A)